The final case on calendar this morning is National Labor Relations Board v. Airgas. Good morning, Your Honor, may it please the Court, I'm Mike Murphy for Respondent Airgas USA, LLC. The National Labor Relations Board committed three dispositive errors in this case. The first was on the predicate finding of a well-established and automatic system of giving wage increases. As the D.C. Circuit stated in Advanced Life Systems, the same facts and arguments about the character of an employer's past pay increases is dispositive of both these allegations, whether they're brought under 8.A.3 or 8.A.5. Counsel, you know we're not bound by a D.C. Circuit opinion. No, you're not. But the inquiry... You said it was dispositive, but... But Your Honor, it is dispositive because you cannot make the 8.A.3 finding without finding the same predicate fact as you need to find for the 8.A.5. I know you're saying that fact, but I just wanted to make sure that you weren't saying that we have to follow the D.C. Circuit. Of course not. No, Your Honor. They said it so eloquently that it was worth quoting. So the first one was the systematic wage increase, the second... That's right. And the second was because they brought it under 8.A.3 instead of 8.A.5, they have to follow a right-line analysis for proving discrimination by the employer. And they erred by not finding... The General Counsel of the National Labor Relations Board did not meet her burden of proof by preponderance of the evidence to show the employer had unlawful anti-unanimous when it made this decision. So in terms of the established practice, right?  So we have... It seems to me like the key evidence here is from Mr. McFarland's testimony about how he decided on the wage increases. And there's competing inferences that you could draw from that, and I think it is certainly open to the interpretation that you are offering. But in order to win, you need to show that the board's contrary interpretation was not supported by substantial evidence. And given what I think is fair to describe as somewhat conflicting evidence, how do you want us to say that? Right. Well, I don't think there was conflicting evidence. I think there were... There's confusing evidence that needs to be sorted through and some math needs to be done. But I don't think there's conflicting evidence. Even the board in its decision couldn't come out and state that there was an automatic process by which employees would understand who's getting an increase and how much based on what criteria. They couldn't say that without adding, with a few exceptions. We're talking about fewer than 20 employees in any one of these given years that everyone is analyzing to determine what this past practice was, what this established working condition supposedly was. And if you take the board literally to say a few, let's say two, that's 10% plus of the population we're talking about. The National Labor Relations Act is administered by frontline managers and workers on a day-to-day basis. A case law that so undermines Supreme Court precedent in NLRB v. CATS by constantly whittling away at this definition of automatic, of established time periods, established amounts, or at least they've decided cases like Omni where every single employee, they might have received different amounts, but there were only a total of two or three amounts and every single person got it and you could predict. I was going to ask you about Omni. Do you think that Omni is wrong? No. Okay. I don't. But so Omni, the board said there that there has to be, I think the phrases are regularity and fixed criteria. But they also said that, this is my phrasing, not theirs, regularity doesn't have to be all that regular and fixed doesn't have to be all that fixed because if the increases are based on economic conditions, you can have some discretion in exactly how you apply it. And it seems like that's kind of what McFarland did. He said, well, we'll give a dollar an hour to the people with a certain amount of seniority and then depending on how much is in the pot, we'll give some other amount to the other people. And so why isn't that consistent with the Omni standard? Well, there may be dicta in Omni that says that, but the facts in Omni are there were fixed times, fixed percentages in one year, and fixed amounts in the other year. And there were no exceptions. There were no few exceptions, 10% exceptions, there were no exceptions at all. So the facts establish that, sure, it doesn't have to be an across the board same amount for everyone, the way one reading of Katz might put it. It can be different amounts as long as all of those amounts are fixed and you can trace how they're attributed to certain employees. Another lead case from the board anyways, Atlantic Care Management, and there the fixed criteria was, okay, we've got this five-tier system of granting performance reviews to employees and there's a percentage amount for the wage adjustment associated with each of those performance reviews. None of that is present in this case. There was no tiered system, there were no fixed amounts, there were no fixed percentages. There may have been, it may have been established, I'm not sure whether it was established under Ninth Circuit precedent, but there were definitely a few years when it was always on October 1st. That wasn't always the case if you go back five years, and certainly not if you go forward, because there was evidence on the record that it changed again to April. But this case, this prosecution of air gas represents taking it too far. You've got Omni and Atlantic Care establishing how you can use a formula or use fixed amounts. But there's no way to back engineer the data on the record in the air gas case to show what criteria Scott McFarland used in those several years before 2018. Counsel, on a slightly different point, do you agree that some non-union employees were provided the raise that was not given to the union employees? Absolutely. And so what are we to make of that fact? I think that's the employer's legal compliance efforts. How so? Well, the employer had planned and decided and budgeted for these increases. For union and non-union alike? For, at the time the decision was made, for non-union. Only non-union? So your representation is that at the time, at this particular time, the company had only budgeted money for wage increases for non-union employees? This evidence is not on the record, but to answer your question, Your Honor. Well, my question was, what are we to make of the fact that at the same time as the company was giving, was declining to give union employees the wage increase, a wage increase was given to non-union employees? That's my question. What are we to make of that? Understood, Your Honor. Thank you for clarifying. The facts of this case are incredibly important for that question because these employees were, prior to October 2018, non-union employees. The union, local 848 of the Teamsters in this case, filed an election petition with the government to represent those employees on, I want to say, August 28th, if memory serves. The employees voted on September 20th. The wage increase for the non-union was scheduled to take place on October 1, but the National Labor Relations Board didn't issue its certification of representation until, if memory serves, October 10th or October 11th. An employer is not allowed to either announce or make any changes in the workplace to working conditions or terms of employment during dependency of an election campaign. Well, but that just takes us back to the Herron Brothers problem, right? That if there were a past practice, then nothing, that wouldn't provide grounds to treat the unionized employees any different. If there was a past practice of granting automatic, fixed, predictable wage adjustments, which the General Counsel did not carry her burden of proof to establish that by preponderance of the evidence. Okay. But in terms of the work that you need this second theory to do as to whether there wasn't animus without even getting into the statements about voting union and raises. Herron Brothers seem to suggest, first of all, I think four years of raises were an established practice. And it just plainly says that cats isn't a problem once you have an established practice. So if there's the practice, then you can't use cats as a reason to deny the union members. If there's an established practice of automatic non-discretionary wage increases, then I can't remember exactly how you said it. So it's not a complete defense to the concerns about discriminating against the union to suggest, well, we couldn't give them those raises because of cats. Is that your argument? It is a complete defense if. If there wasn't a practice. But if there was a practice, it's not. If there was a practice of non-discretionary fixed predictable wage increases, it's not correct.  Yes. And then the third error is even assuming the general counsel carried her burden of proof to establish by preponderance of the evidence that the employer had this established practice of a non-discretionary wage process and harbored the required animus under right line, which is required for all 83 cases. And this case was prosecuted under 83, not 85. You have to follow the right line doctrine, which allows the employer to assert an affirmative defense. In this case, the employer asserted a non-discriminatory affirmative defense, and it was unrebutted. What was the affirmative defense? That the employer was driven by a concern with compliance with the law when it withheld. The argument you just made about? Yeah. Okay. But there was no rebuttal made. There was no contrary evidence introduced, and there was no attempt to prove pretext on the employer's stated reason for this decision. Well, there were statements that pointed to a different reason why the action was taken. So that was implicit rebuttal because there were some pretty definitive statements made about what might happen if the union came in and that you were going to get a pay raise, but perhaps not now. So that's also indirect evidence of the motive. It is not nearly as altruistic. Your Honor, I would just point out a caveat at work here, which is that although, and I'm not clear on exactly which statements you're referencing, some of which are protected by 8C, but right lines... The ones I'm referencing are ones that were openly discussed in the record. Yes. Okay. I know. But some of those are protected by 8C is all I'm saying. Well, that's...  But right line allows for analysis of dual motive cases. The whole point of the affirmative defense is the employer is saying, here's the decision we made. We would have made this decision even in the presence of anti-union animus. The problem is the record is thin on that point. The record evidence is thin on that point. So if we're in the record, is there a statement or anything other than a post hoc statement that says that the decision was made in an effort to comply with the law? It's not a post hoc, but I'll provide sites to the record. Okay. Okay. I saw it in the briefs, but I'm trying to see where is some record evidence. So there's record evidence at ER 50, ER 125 through 74, ER 54 through 56. 125 through 74, is this a big gap? That's a lot of information, right? Okay. And what's the other one? ER 54 through 56. Okay. All right. Could you... ER 48 and ER 50. Okay. ER 48. ER 48, ER 50. I'll look at that while you're seated. But did you want to conclude your remarks before you have... Yeah. Yes. Yes, Your Honor. In conclusion, this decision undermines Supreme Court precedent in NLRB v. CATS by creating ambiguity for employers not knowing when they must stop with discretionary processes or how to even determine whether something is discretionary or automatic. Again, you can't have a definition of non-discretionary automatic that has a 10% gap loophole in it. And because this was brought under 83, by preponderance of the evidence, the GC is under additional burdens of proof to show animus by the employer and then to rebut any affirmative defense offered by the employer, which did not happen here. Thank you, counsel. Thank you, Your Honor. Let's hear from the government. Good morning. May it please the Court, Joel Heller for the National Labor Relations Board. Substantial evidence supports the Board's factual finding that Airgas had a past practice of annual wage increases for the Burbank drivers and that Airgas withheld that raise once the drivers unionized. That's a straightforward act of retaliation that violated the National Labor Relations Act. Airgas asked the Court to reweigh the evidence on appeal, but of course that is inconsistent with the standard of review for such issues. There was a past practice, and that is demonstrated by documentary and testimonial evidence, that for at least the past four years, every October, the Burbank drivers received a wage increase. This was based on fixed tenure-based criteria in which there were two tiers of employees. If you had been hired in 2011 or later and had at least 12 months on the job at Airgas, you received $1 an hour every October for those four years. If you had been hired before 2011 or had less than 12 months of experience, you received a lower amount, between $0.50 and $0.60. And in any given year, everyone in that second category received the same amount. So it was $0.50 in 2014, $0.50 in 2015, $0.60 in 2016, and $0.55 in 2017. Again, that was across the board for everyone in that second category. This is demonstrated by spreadsheets in the record that Airgas created and that were submitted as joint exhibits pursuant to a stipulation. It was also corroborated by McFarland's testimony, where he said he had a philosophy, he had a process by which he gave the $1 an hour increases to the more recent hires in order to keep them on the job. And what was left he gave in that other fixed amount to the other employees in that second category. And I would point you to his testimony at Excerpts of Record 86, where he was asked, the process you used in doing that, did that change any over the period 2014 to 2017? His answer, no, it did not. So the person in charge of deciding how much the wage increase was testified that he had the same process for this entire period. But in 2018, when the drivers unionized, they did not get, and only those unionized drivers, did not get the increase. It was given to the non-union employees only. The evidence of deviations from this process that Airgas talks about in its brief, as we detail in detail in our brief and in the board's decision, those were different types of employees. Those were production employees, not the drivers. The production employees didn't unionize, and they got the increase. So the focus should be on what the drivers got in past years, not what the production employees got in past years. So the fact that there may be some production employees whose raises didn't follow this set, that's immaterial to the board's decision here. And also we point out how some of their examples are factually incorrect. I'm happy to address any of those if the court wishes, but, again, it's laid out in detail in the briefs. The evidence that they deviated from this past practice because the drivers union voted to unionize. Judge Relinson, you pointed out these statements in the record where they're consistently telling the drivers things like, remember, October is coming, which is when they would receive their raises in the past. If you guys vote the union in, we can't help you with the raises. I told one person, you were looking at a raise. Another Airgas official came in right after and says, but if you guys vote the union, it's going to get ugly. Are any of those protected, those statements? No. I mean, they mention 8C in the arguments here today, and I believe it's in the brief once, but there's no developed argument. So I would argue that that argument has been waived by not spelling it out, which statements they believe are protected, why they believe that it's protected. There's no argument about that in their brief. And, of course, 8C doesn't protect threats, and these are pretty clear evidence of threats. If you vote for the union, you don't get the raise. But on the other hand, it says if you guys don't vote in the union, wages are back on the table. So those are all statements in the record by multiple Airgas officials. As you were pointing out, Judge Johnstone, there's no Katz defense here because there is this established past practice. So essentially, the Katz argument is just a repackaged version of the factual argument, whether there was a past practice or not. If there was a past practice, there's no Katz defense. And we have shown substantial evidence, which, again, is the standard of review here, that there was this past practice. Airgas counsel a couple times talked about preponderance of the evidence. That would be the standard before the board, in proceedings before the board. But on appeal, of course, the question is whether there's substantial evidence in the record to support the board's finding. And it's the record considered as a whole. So, of course, you look at McFarland's testimony. You also look at the documentary evidence. You look at everything. And the board, of course, rightfully did that. And for the same reason that there's no Katz defense, they can't use their supposed bargaining obligation as a right-line defense. It's the same argument for both of those points. There was a past practice, so Katz doesn't prevent them from granting the wage increase, as this court recognized in Aaron Brothers, as you mentioned, Judge Johnstone. And for that same reason, it means there's no right-line defense by pointing to your obligations to bargain under the Katz doctrine. And, of course, they're making this argument that they believed, maybe, that they had this obligation to refrain under Katz from making the increases. That's wrong as a matter of law, but it's also not borne out by the record because if they were truly concerned with the need to bargain over these raises, they could have gone to the union and offered to bargain over these raises, but they didn't do that. So, right. So this is not only legally insufficient, but it is also a pretext, evidence of pretext in the context of the right-line parlance. And, right. This is more, Judge Rawlinson, you said, there were some statements saying perhaps they wouldn't get the raises. I think this is stronger than perhaps. I think it is pretty clear they were telling employees on multiple occasions that if you vote for the union, you're not going to get the raise, and, of course, that is what happened. Just one point about the advanced life systems decision in the D.C. Circuit. We don't have a dispute with the kind of legal reasoning in that case. That was the reason that the D.C. Circuit ruled against the board in that case was as a factual matter they found that there was not sufficient evidence showing that there was a past practice of annual wage increases. And we explained in the brief how that's distinguishable. It was over a much longer period of time when there were raises given and a broader range of amounts. Here, as I've said, it was every October for at least four years and more likely five. And it was the set amounts for one category and only a small range for the second category. And it doesn't matter when the raises were given, pre-2013 or post-2018, because the question, the board's finding was based on the 2014 to 2017 window. Was there an established practice there? So whether there was or was not established practice before then doesn't matter to the board whether that board finding was correct. There is nothing in the record that suggests that the past practice was based on a percentage that you would plug in, so the fact that there was differing percentages over time doesn't matter. And the reason there were different percentage increases is because these employees had different wage rates to begin with before the raises were put into effect. One other point I was going to say, but no longer. Oh, yes, Omni. So, again, there's nothing. This is just an application of the same principles that were set forth. Omni didn't establish anything. That was just applying existing precedent to the facts of that case. And the facts of that case aren't even that distinguishable from the facts of this case. Those raises were different from year to year, 3%, 4%, 3.5%. So that's kind of like the second category where they got 50 cents one year, 55 cents another year. And even stronger in this case, we have that first group of employees that got $1 every year from 2014 to 2017. So, again, I guess I will just end where I started. This is a substantial evidence case. You're looking about whether a reasonable mind might accept as adequate to support the conclusion the Board found. And I believe that is clear from the evidence that even if there's another way to read the evidence, which I'm not sure there is another reasonable way to read the evidence, the fact that doesn't change substantial evidence review, that the Board's reading of the evidence here was reasonable. I'm happy to answer any questions about that or the other violation. If not, then I will rest on my brief for the remainder. All right. Thank you for your time. Thank you, counsel. Let's have two minutes for rebuttal. Thank you, Your Honor. First of all, I'd like to address the issue of if the employer thought or had any questions, it could have relieved those by going to the union and offering to bargain over that. At no time during the election process from the filing of the petition until a Board issued its certification of representative was the employer free to, and this is what the dissent in the Board's decision explicitly talks about. When former Chairman Kaplan, chairman at the time of this briefing, stated in the dissent that the employer could not act here without running the risk of violating other sections of the act given this prosecution. One of the things I believe he was referring to is the fact that we would have violated 8A2, which prohibits dealing with a non-certified or non-representative union of a group of employees. We were stuck in the laboratory conditions doctrine, and then we moved into the unilateral change doctrine. As soon as we were there, as soon as bargaining commenced with the union, Airgas provided notice of this process from October 1st and offered to bargain over it. Not insignificantly, the union said, no, thank you, we want to defer bargaining on this until after all language issues. I thought the notice was to bargain on the process but not the wages. No, the offer was to bargain over the wages, Your Honor. And we made the same offer. We provided the same notice and made the same offer the following year, and they also turned us down that year and deferred it again to the end of all language issues. So you gave me some record sites for evidence of the decision not to offer wages because of fear of running afoul of the act. So I'm looking at page 50, and I want you to tell me the precise language on that page that you say is evidence that the employer acted out of caution against violating the act. So what language in there should I be looking at to confirm that representation? Page 50? Yep. All right.  This is testimony that goes to ‑‑ I'm asking you to give me the precise language on that page that confirms the representation that the company was acting out of a desire not to run afoul of the act. There's nothing on this page that addresses that. Okay, so let's turn to pages 125 to 74, which is the contract proposal. So tell me what language between those pages constitute evidence that the company was motivated out of a desire to comply with the act. Okay. Okay.  Page 125. Okay. So if you ‑‑ Okay. If I could direct your Honor's attention to page 126. Okay. At the very bottom, although the employer is fine bargaining non‑economic proposals first, the employer states at the very outset of bargaining that we are willing to bargain over economic items at any time. The employer and the union have already corresponded and agreed to bargain over two 2018 gain share payments because of the timing of the RC petition in this case in 2018. So what does that say? The employer did not conduct ‑‑ What does that say? What evidence is that of the motive of the company? It's explaining to the union why we didn't unilaterally implement it at the time because we were ‑‑ Page 126, where does it say that? Bottom of page 126 into page 127. That we are willing to bargain over economic items at any time? Yeah. And then on the next page where it details the timing of the RC petition in this case? The employer did not conduct a market analysis. And then as a result, the employees did not receive wage adjustments. That's your governance?  And then page 54 to 56, what's your language? I believe 54 and 56 is a discussion of how the bargaining got underway and was provided because it's context for the exhibit that we were just discussing at 126 and 127, but I'm going to review it right now. So there's nothing in there that expressly addresses the motive? Your Honor, I haven't reviewed page 54, page 56 yet. Well, I would assume you would have reviewed it before you came if you're relying on it. I mean, I did review it, but you're asking me directly right now. Okay. The answer to your question, Your Honor, is that these pages discuss how the bargaining started, when the bargaining started, and what documents were exchanged. Okay. And so how does that set forth the motive of the company to not run? Because it establishes that I explained to the union rep, both verbally and in writing, why the employees did not receive an increase in 2018, October, and that we were now willing to bargain over that if the union wanted to. And then the union said, no, thank you. So what page is that? Again, that is on 126 into 127. Oh, I thought you said, oh, I thought we were on 54 through 56. Those are the pages where I established how we were bargaining. All right. Okay. I get the drift. Okay. Cool. Thank you. Okay. Thank you. Any additional questions? All right. Did you want to wrap up, counsel? Did you want to wrap up? Oh, sure. Thank you. So, again, the employer could not offer to bargain over this at the time without violating 82. The employer could not unilaterally implement this wage adjustment process, which, and I think opposing counsel's description of 2011, if you were hired after it, you got this. But if you were hired before another, like, when Kaplan in his dissent described this process, described the board's decision as painting the bullseye around the arrow, that's precisely what he was talking about. There is no way to back engineer this process to produce, there's no way to remedy this. There's no way to produce wage increases to calculate what wage increases should have applied to each individual employee in 2018. The standard review didn't carry the day with the board. That's a dissent. And so our standard review here is whether or not there is substantial evidence to support the majority decision. And I'm arguing that there wasn't for three reasons. We heard them. Okay. All right. Thank you, counsel. Thank you to both counsel for your helpful arguments. The case is argued and submitted for decision by the court. That completes our calendar for the day. We are on recess until 9.30 a.m. tomorrow morning. All rise.
judges: RAWLINSON, MILLER, JOHNSTONE